**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, Plaintiff–Appellee,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellant.**

No. 93–3088.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1994.

Decided May 16, 1994.

Solomon I. Hirsh, Chicago, IL, John O'B. Clarke, Jr. (argued), Highsaw, Mahoney & Clarke, Washington, DC, for plaintiff-appellee.

Thomas J. Knapp, Lawrence M. Stroik, Charles W. Shewmake (argued), Fort Worth,

TX, Kenneth J. Wysoglad, Michael L. Sazdanoff, Wysoglad & Associates, Chicago, IL, for defendant-appellant.

Before FLAUM and EASTERBROOK, Circuit Judges, and MILLER, District Judge.*

EASTERBROOK, Circuit Judge.

Steep curves must be lubricated for trains to run properly. Members of the Brotherhood of Maintenance of Way Employees (BMWE) performed this work for the St. Louis–San Francisco Railway, now part of the Burlington Northern Railroad (BN). In February 1987 the BN began using an automated lubrication system on a stretch of track between Springfield, Missouri, and Hoxie, Arkansas. A track inspection vehicle, already used for other purposes, was outfitted to dispense grease at the flip of a switch. Because a supervisor, who does not belong to the BMWE, operates this apparatus, the union filed a grievance, which came before the National Railroad Adjustment Board for decision.

The Adjustment Board has five delegates from unions and five from management, joined by a referee chosen for the occasion. On this occasion the representatives of labor and management disagreed, so referee Elliott H. Goldstein held the casting vote. He sided with the BMWE. The Board's opinion concedes that the new apparatus applies grease to track that the BMWE's members had not lubricated in the past but concludes that the work nonetheless belongs to the BMWE, because it is the same kind of task the union's members had performed. The award sustains "Section 1 of the instant claim" but refuses to award back pay to the employees who filed the grievance: "Claimants were fully employed on the claim dates in question and suffered no loss of earnings as a result of the Carrier's improper action."

Burlington Northern gave the lubrication work between Springfield and Hoxie to the BMWE's members but declined to apply the Board's rationale to the entire Frisco system. This led the BMWE to seek enforcement under 45 U.S.C. § 153 First(p), which provides: "If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court" an application for enforcement of the award. According to the BMWE, the Board's award gave it jurisdiction over all track lubrication in the Frisco system; the BN insisted, in reply, that the award addressed only the Springfield to Hoxie line, something demonstrated by the denial of monetary relief on the ground that the claimants had been fully employed on particular days. The award itself—"Claim sustained in accordance with the Findings."—is less than pellucid. What was the "claim"? The documents the union filed with the Board might be read to address one line of track or might be thought to encompass the whole system. The Board's opinion describes Claim 1 as a contention that "[t]he Agreement was violated when the Carrier assigned Track Supervisor L. Prichard instead of Foreman H.L. Woodward and Trackman T.M. Freeman to perform curve oiling work beginning February 9, 1987", but perhaps the Board meant its award to control more than just one work assignment.

■ The Railway Labor Act provides a way to find out. "In case a dispute arises involving an interpretation of the award the division of the Board upon request of either party shall interpret the award in light of the dispute." 45 U.S.C. § 153 First(m). Neither side asked the Board to interpret its award. Instead the BMWE asked the district court to "enforce" the award systemwide, on the theory that no "interpretation" is necessary. By contending that the court need not interpret the award, the BMWE sought to avoid the principle that disagreement about the meaning of an award amounts to disagreement about the meaning of the underlying collective bargaining agreement. Under the RLA such disagreements are "minor disputes" that the parties and the Board must resolve without judicial aid or interference. E.g., *Consolidated Rail Corp. v. Railway Labor Executives' Association,* 491 U.S. 299, 302–03, 109 S.Ct. 2477, 2480,

* Hon. Robert L. Miller, Jr., of the Northern District of Indiana, sitting by designation.

105 L.Ed.2d 250 (1989); cf. *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978). "[T]he judicial duty to enforce an arbitration award [under the RLA] ... is neither a duty nor a license to interpret it." *Brotherhood of Railway Carmen v. Atchison, Topeka & Santa Fe Ry.,* 956 F.2d 156, 160 (7th Cir.1992). (The Board's processes are a form of arbitration.)

The district court recognized the limits on its authority. "If the Award is clear, I have to enforce it. If it is not clear, I have to dismiss this case or remand the matter to the Board. I cannot, under any circumstances, interpret the collective bargaining agreement. If there is an unclear award and the parties argue over the meaning of the collective bargaining agreement, their argument is a minor dispute which must go to arbitration." 819 F.Supp. 745, 747 (N.D.Ill.1993). Nonetheless, the court observed, enforcement supposes interpretation. Language is not self-decoding. "A court [therefore] can resolve ambiguities unless they implicate an area within the special expertise of the Board." *Id.* at 748. Whether this award covers the whole system is not a question within the Board's expertise, the district judge concluded. It held that the Board's view of the collective bargaining agreement's meaning necessarily applies to all lines of track:

> Clarity of an award can always be disputed, all language can be deconstructed. Some of the Railroad's argument is of this type. It says, "The Award *concerned* a particular segment of ... track form [sic] Springfield, Missouri, to Hoxie, Arkansas, and the time claims of only two ... employees" (emphasis added). It is also true that *Gideon v. Wainwright concerned* a particular criminal conviction in Florida and the claim of one inmate. *Marbury v. Madison* also concerned the claims of a small number of people and simple ministerial acts.

819 F.Supp. at 747 (emphasis in original). This understanding led the district judge to enter an injunction: "defendant Burlington Northern Railroad Company, its officers, agents and all persons acting in concert with it ... are hereby enjoined and restrained from assigning hyrail curve oiling work on the former Frisco territory to individuals who are not covered by the collective bargaining agreement between the BMWE and BN for that portion of the BN."

By referring to *Gideon* and *Marbury* the district court conjured up the principles of *stare decisis* that mark a common-law system of adjudication. A judicial decision's formally binding effect is limited to the parties' precise dispute, but the reasons a court gives for the judgment may have broader significance. The Adjustment Board's opinion contains major and minor premises leading to a conclusion. As the district court understood the opinion, the minor premises include propositions such as "the collective bargaining agreement awards to the BMWE all tasks similar to those its members have historically performed" and "automated track lubrication is similar to the curve oiling the BMWE's members have historically performed." These conclusions led the Board to a particular decision about the Springfield–Hoxie line. Given general application, after the fashion of *stare decisis*—more properly, issue preclusion (collateral estoppel), because the same parties will be involved in any future dispute, see *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984)—these propositions support the more comprehensive terms of the district court's injunction.

Equating arbitration with a common-law system of adjudication is hazardous. American courts often enforce the minor premises contained in opinions from the same or a higher level of our hierarchical judiciary. Exceptions aplenty lurk in the word "often." One district court's interpretation of a statute does not bind the United States nationwide in similar disputes. *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). One court of appeals does not automatically follow the decision of another. Courts may overrule or distinguish their own decisions. Even the stronger principles of issue preclusion do not forbid all attempts to narrow or overthrow a precedent. In civil law nations, courts deny that their judgments have any *stare decisis* effect. Administrative agencies and arbitrators may

(and sometimes do) model their procedures on the civil rather than the common law; administrative law judges in social security cases, and arbitrators in commercial disputes, have more in common with European magistrates than they do with judges of the district courts. Even within a system of common-law adjudication courts rarely use an injunction to determine the scope of an earlier decision. In the main, preclusion is an affirmative defense, and the second tribunal determines the effect of the first judgment.

What we need to know is whether the National Railroad Adjustment Board follows principles of issue preclusion so powerful that the first award blocks any attempt to litigate its scope. For this is what has happened; the district court's injunction makes it futile for either side to ask the Board to reach a different decision concerning a different line of track. Preclusion so sweeping is hardly inevitable. In the world of labor arbitration, the preclusive effect of the first arbitrator's decision is an issue for a later arbitrator to consider, for "the scope of the arbitrator's authority [to determine the preclusive effect of an earlier award] is itself a question of contract interpretation that the parties have delegated to the arbitrator." *W.R. Grace & Co. v. United Rubber Workers*, 461 U.S. 757, 765, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). See also *Production & Maintenance Employees v. Roadmaster Corp.*, 916 F.2d 1161, 1162–63 (7th Cir.1990); *United Mine Workers v. Inland Steel Co.*, 876 F.2d 1288, 1295 (7th Cir.1989); *Hotel Association of Washington v. Hotel Employees*, 963 F.2d 388 (D.C.Cir.1992); Frank Elkouri & Edna Asper Elkouri, *How Arbitration Works* 416, 422 (4th ed. 1985). Federal courts do not enforce rules of preclusion divorced from the norms of the tribunals that rendered the judgments. When the first judgment is rendered by a state court, that state's rules of preclusion determine its effect in federal court. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); 28 U.S.C. § 1738. So too with arbitral awards. Preclusion depends on the force the arbitrator (here, the Adjustment Board) gives to the award. Surely the BMWE and the BN *may* establish that the minor premises in the first award will control, but *whether* they have so provided is a question about the meaning of their collective bargaining agreement—a question that under the Railway Labor Act must be presented to an Adjustment Board.

According to the BMWE cases such as *Grace* and *Roadmaster* are not instructive because they dealt with efforts to block successive arbitration, while the district court's injunction in this case does no more than provide what happens until another arbitration occurs. *Roadmaster* indeed involved an employer's effort to avoid submitting a grievance to successive arbitrators, but in *Grace* the second arbitration had occurred. The court of appeals in *Grace* approached the issue by asking whether the first award was a proper exercise of the arbitrator's power to construe the contract; the Supreme Court pointedly remarked that the only issue the court of appeals should have considered was whether the second arbitrator could resolve the preclusive effect of the first decision. 461 U.S. at 765 & n. 7, 103 S.Ct. at 2183 n. 7. At all events, the line between granting an injunction based on the first award and enjoining a second arbitration is thin. Suppose the BMWE and the BN take a second track lubrication dispute to the Adjustment Board, which decides that automated hyrail curve lubrication on track between Helena, Montana, and Boise, Idaho, is *not* within the BMWE's jurisdiction. Any effort by the BN to enforce that award would place it in contempt of the injunction issued in this case.

Indeed, so comprehensive is the district court's injunction that it also forbids any effort by the BMWE and the BN to negotiate about the assignment of work. Before the district court entered its injunction, the BMWE and the BN had signed a side letter agreement permitting supervisors to perform automated lubrication on a portion of the Frisco system. Reading the injunction to annul this agreement, the BN has given that work to BMWE members pending the disposition of this appeal. Any injunction that *displaces* the results of labor negotiations is impossible to sustain. Although the BMWE treats the effect of the order on future arbitration and on letter agreements as glitches, to be cured by asking the district court to

modify its order, the very fact that the injunction gives the district judge an active role in adjusting the parties' future relations demonstrates how problematic the order is under the RLA.

Nothing that we have said so far excludes the possibility that the Adjustment Board, in its role as an arm of the national government, applies principles of issue preclusion independent of the collective bargaining agreement and award at issue. The Board is a creation of the national government, and at least in principle could create interpretive rules independent of the parties' bargain. A court might implement such norms without interpreting either the particular award or the underlying agreement, and therefore without exceeding its powers. For example, if the Board understood its decisions as equivalent to express provisions in collective bargaining agreements, any effort to undermine an award would amount to a request to amend the contract, setting off a "major dispute" and blocking any change until the statutory period of negotiation had passed. Neither the Board nor the courts understand arbitral awards in this way, however, and we reject the BMWE's effort to equate successive arbitration with renegotiation. See *CSX Transportation, Inc. v. United Transportation Union,* 879 F.2d 990, 1004–05 (2d Cir. 1989).

The district court did not explore the Adjustment Board's jurisprudence, the union does not contend that the Board has a developed system of issue preclusion, and for all we can see the Board conceives its role strictly as one of interpreter, sending us back to the collective bargaining agreement in search of rules of preclusion. Still, one of the Board's procedural devices sheds some light on the subject at hand. When multiple grievances pending at the same time depend on resolution of a single issue, the parties often designate one of the grievances as a "lead case" whose resolution controls the others. Such a designation would be unnecessary if the first case to be decided had preclusive effect automatically. "Lead case" designation informs the parties that they must assemble all of their evidence and make their best arguments in a single forum; the absence of such a designation implies that the parties need not concentrate their artil-

lery but may make investments proportional to the stakes. Our case may be a good example. The railroad could tell at a glance that its financial exposure was minimal (zero, the Board eventually decided) and may have elected to make a cursory presentation. It tells us that other evidence, not presented to the Board in this case, supports its position.

Because this was not a "lead case," the Board permits each side to try again, with better arguments and evidence. It applies not principles of preclusion but an approach very much like the "law of the case": the Board feels free to disregard an earlier decision that appears "palpably erroneous" in light of the evidence and arguments in the second arbitration. E.g., *Brotherhood of Maintenance of Way Employees—Burlington Northern Inc.,* Award No. 22374 (3d Div.—Sickles 1979), at 2. Such a formulation implies that the BN has tough sledding ahead if it tries to persuade the Board to alter course. We have not seen, and are not authorized to inspect, the evidence the BN wants to offer to the Board. Whether it meets the Board's standards is a question for the Board itself under 45 U.S.C. § 153 First(m); it is enough to say that the district court should not have blocked the inquiry.

REVERSED.